# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **BERLIN PACKAGING, LLC,** | ) | |
| **a Delaware limited liability corporation,** | ) | |
| | ) | |
| **Plaintiff/Counter-Defendant,** | ) | **Case No. 03 C 7636** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **STULL TECHNOLOGIES, INC.,** | ) | **Magistrate Judge Morton Denlow** |
| **a New Jersey corporation,** | ) | |
| | ) | |
| **Defendant/Counter-Plaintiff.** | ) | |

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

This matter comes before the Court on Plaintiff Berlin Packaging, LLC's ("Berlin")
motion for partial summary judgment regarding the issue of trade dress infringement. Berlin
requests a declaratory judgment that its use of alleged trade dress for a container cap does
not infringe any trademarks or trade dress owned by Stull Technologies, Inc. ("Stull").
Berlin argues that its use of the cap does not violate any trade dress because the features of
the cap are functional and it has a constitutional right to copy the cap by reason of an expired
utility patent under United States patent laws. Stull contends that Berlin's motion for
summary judgment should be denied because there are genuine issues of material fact for
trial. The Court finds that no genuine issues of material fact exist. For the reasons set forth
below, Berlin's motion for partial summary judgment is granted.

## II. BACKGROUND[1]

The cap at issue in this case (the "Cap") was designed in the late 1970s by Gene R. Stull, President, C.E.O. and owner of Stull. G. Stull Decl. ¶ 1,7. Gene Stull has been working in the packaging and plastics industries for over thirty years and holds over thirty patents in both the U.S. and worldwide. G. Stull Decl. ¶ 3. Stull is in the business of manufacturing, marketing, selling and distributing child-resistant bottle closures and caps. Answer ¶ 3. Stull was the assignee of U.S. Patent No. 4,281,778 (the "'778 Patent") entitled "Locking closure cap" which expired on or before January 18, 2000. Comb. Resp. ¶ ¶ 6,7.

The '778 Patent describes a child proof closure that attached to containers for various types of liquids, including toxic and/or flammable liquids. '778 Patent, Col. 1, Lines 5-8. The shape of the top of the closure was semi-circular and contained a tab in the shape of a circle with two triangular edges on its front in the design of a "cat face." The closure also contains a single strap at the back of the tab and three holes in the orifice area to squirt liquid, rather than pour liquid. '778 Patent, Col. 5, Lines 4-10; 39-42.

After the '778 Patent expired in 2000, Berlin began promoting and attempting to sell a charcoal lighter fluid closure that is nearly identical to that of the Stull cap. G. Stull Decl. at ¶ 9. On August 12, 2003, Stull obtained U.S. trademark registration number 2,749,627

---

[1]The facts are taken from Gene Stull's Declaration ("G. Stull Decl. ¶ _"), from Stull's Local Rule 56.1(a)(3) Combined Response to Statements of Material Fact as to which there is no issue and Statement of Additional Facts precluding Summary Judgement ("Comb. Resp. ¶ _"), from the Answer and Affirmative Defenses to Amended Complaint for Declaratory Judgment and other relief ("Answer ¶ _"), and the '778 Patent ("'778 Patent, Col. _, Lines_").

for the trade dress associated with the closure cap. G. Stull Decl. at ¶ 8. As a result of the trade dress, Stull sent a demand letter to Berlin in which Stull alleged that Berlin's closure for lighter fluid violated Stull's rights and demanded that Berlin discontinue manufacturing, marketing and selling the cap. Stull's Combined Resp. ¶ 12. In August 2003, Berlin brought an action against Stull for a declaration by the Court that Berlin's use of alleged trade dress for the cap does not infringe any valid trademarks or trade dress owned by Stull and for an order canceling Stull's U.S. Trademark Registration No. 2,749,627. Stull filed a counterclaim against Berlin for trade dress infringement and dilution, false designation of origin, passing off, deceptive trade practices and unfair competition.

Berlin now moves for partial summary judgment. Berlin seeks summary judgment on Count I (Declaratory Judgment as to the Lanham Act) and Count II (Declaratory Judgment as to Illinois Law) of its amended complaint, but does not seek summary judgment on Count III (Cancellation of Stull's Trademark Registration). In addition, Berlin seeks summary judgment on Counts I through VII of Stull's counterclaim.

### III. LEGAL STANDARDS

#### A. JURISDICTION

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, 1332, 1338(a) and 1338(b); 15 U.S.C. § 1121; and 28 U.S.C. § 1367. Venue in this district is proper pursuant to 28 U.S.C. § 1391. The parties have consented to a Magistrate Judge's jurisdiction pursuant to 28 U.S.C. § 636(c)(1).

#### B. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the record shows that there is no genuine issue as to any material fact, and that the moving parties are entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249-50; *see also 444 NutraSweet Co. v. X-L Engineering Co.*, 227 F.3d 776, 785 (7th Cir. 2005). In deciding a motion for summary judgment, the Court must view all evidence in light most favorable to the nonmoving party, *Germano v. Winnebago County, Ill.*, 403 F.3d 926, 927 (7th Cir. 2005), and must draw all reasonable inferences in the nonmovant's favor. *Harper v. Albert*, 400 F.3d 1052, 1067 (7th Cir. 2005).

When a material fact or a set of facts yields competing, but reasonable, inferences, then there is a genuine issue that precludes summary judgment. The non-moving party's burden is to identify facts that are both material and genuinely disputed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). To be material, a fact must be outcome determinative under the substantive law governing the motion. *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598-99 (7th Cir. 2000). A "genuine issue" exists when the party opposing the motion for summary judgment serves and files, pursuant to Local Rule 56.1, a concise statement outlining the material facts that require denial of summary judgment, supported by citations to the evidentiary materials that support those denials (e.g., affidavits, depositions, answers to interrogatories, admissions etc.). Fed. R. Civ.P. 56(c). Although the party seeking

summary judgment bears the initial burden of proving that there is no genuine issue of material fact, *Celotex*, 477 U.S. at 323, the non-moving party cannot rely upon the pleadings alone, but must use evidentiary tools outlined above to identify the material facts that show there is a genuine issue for trial. *Id.* at 324, *Insolia*, 216 F.3d at 598.

## IV.  DISCUSSION

Berlin now moves for partial summary judgment on Stull's trademark and related claims as a matter of law because the elements of the cap are functional.  The question in this case arises at the intersection of the United States' patent and trademark laws.  The principal issue concerns whether the product features of the cap are functional.

## A.  RELATIONSHIP BETWEEN PATENT AND TRADEMARK LAW

There is an "undeniable tension" between trademark protection of product configurations and patent law. *Thomas & Betts v. Panduit Corp.*, 138 F.3d 277, 285 (7th Cir. 1998)*(T & B II).*  However, "[w]hen confronted with apparently conflicting statutes which are 'capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.'" *Id.*  (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1018 (1984)).  In patent law, the purpose is to encourage innovation while inviting competition; the recipient of a patent is granted a monopoly for a limited time, after which the innovation passes to the public for copying and improvement. *T&BII*, 138 F.3d at 283.  However, awarding the recipient of a patent a monopoly forever, as is provided by trademark protection, is incompatible with the purpose of patent law; patent law favors dedicating innovations to the public and trademark law

5

advocates perpetual protection for innovations in order to prevent consumer confusion.  *Id.* at 283-284.

This tension is the subject of the dispute presented by the parties.  In this case, it is alleged that Stull's claimed and registered trade dress for its cap was also disclosed and claimed in its expired utility patent.  Because the heart of this dispute is the relationship between patent and trademark law, it is appropriate to begin with a summary of the purposes of and policies behind each.

## 1.    Patent Law

It is at the heart of patent law to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time after which competitors are free to use the innovation.  *Qualitex*, 514 U.S. 159, 164-165 (1995).  "Copying is not only good, it is a federal right–a necessary component to the patent system's grant of limited monopolies."  *Thomas & Betts Corporation v. Panduit Corp*., 65 F.3d 654, 657 (7th Cir.1995)("*T&B*").  For an invention to be patented, an item must fulfill three conditions: it must be novel, it must possess utility, and it must be non-obvious.  *T & B II*, 138 F.3d at 283; *see generally Kewanee Oil Co. v. Bicron Corp*., 416 U.S. 470, 480 (1974).  Those inventions meeting the conditions are granted patent protection, which gives the inventor a twenty year monopoly on the manufacture or exploitation of the device.  *Id.*  After the expiration of the patent, the public is free to copy and profit from the invention.  *Id.*

## 2.    Trademark Law

It is the purpose of trademark law not to encourage invention, but to promote competition and maintain quality by protecting the reputation of the producer for an unlimited time. *Qualitex*, 514 U.S. at 165. Trademarks are protected "in order to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers." *T & B II*, 138 F.3d at 284. In order for a mark to be registered as a trademark, it must be capable of distinguishing the applicant's goods from those of others. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). Trademarks can include "any word, name, symbol, or device, or any combination thereof." 15 U.S.C. § 1127 (2005).

Trade dress refers to the design or packaging of a product which serves to identify the product's source. *Traffix Devices v. Mktg. Displays*, 532 U.S. 23, 28 (2001). Trade dress protects the product's entire appearance and image and includes features such as size, shape, color, graphics, packaging and label. *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 20 (7th Cir. 1992). "Trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products." *Traffix*, 532 U.S. at 29. Therefore, one who seeks to establish trade dress protection for a feature that was claimed in an expired patent, must show that the feature is not functional by showing that it is only an incidental, arbitrary or ornamental aspect of the device. *Id.*

The Lanham Act, which establishes a cause of action for trade dress infringement, gives a seller or producer the exclusive right to "register" a trademark and to prevent his or her competitors from using that trademark. *Qualitex Co. v. Jacobson Products Co., Inc.*, 514

U.S. 159, 164-165 (1995). In order to prevail on a claim for trade dress infringement under the Lanham Act, a claimant must demonstrate that: (1) its trade dress is primarily non-functional; (2) its overall image has acquired distinctiveness through secondary meaning; and (3) the similarity of the non-claimant's trade dress causes a likelihood of confusion as to the source or affiliation of the product. *T & B II*, 138 F.3d at 284.

When a party receives a federal trademark registration from the Patent and Trademark Office ("PTO"), it is entitled to a presumption that the mark is valid, that the party is the owner of the mark, and that the party has the exclusive right to use the mark in commerce in connection with the services specified in the certificate of registration. 15 U.S.C. § 1057(b). This presumption can be rebutted upon a showing, by a preponderance of the evidence, that the mark is not protectable. *Door Systems Inc. v. Pro-Line Door Systems Inc.*, 83 F.3d 169 (7th Cir. 1996). However, this presumption dissolves upon the presentation of any evidence of invalidity. *Id.*

**B.   THE TRAFFIX DECISION**

Until 2001, when the Supreme Court decided *Traffix Devices v. Marketing Displays,* the law was unclear as to the legal significance of an expired utility patent on a patentee's claim for trade dress protection. 532 U.S. 23 at 28. Specifically, the Circuits were split on the issue of "whether the existence of an expired utility patent forecloses the possibility of the patentee's claiming trade dress protection in the product's design." *Id.* The *Traffix* Court set out to answer this very question.

*Traffix* involved a trade dress dispute over wind-resistant, mobile traffic stands.

Marketing Displays, Inc. ("MDI") was the original manufacturer and seller of these sign stands. MDI owned two utility patents for the mechanism which kept the signs from being blown over in the wind; the mechanism consisted of two springs (the dual-spring design). *Id.* at 25. When the patents expired, TrafFix Devices, Inc. ("TrafFix"), a competitor, started to sell virtually identical sign stands with the same spring mechanism. *Id.* at 26. MDI sued TrafFix for trade dress infringement pursuant to the Lanham Act. *Id.*; 15 U.S.C. § 1051 *et seq.*

### 1.    The District Court Decision

The district court ruled in favor of TrafFix and against MDI on cross-motions for summary judgment on MDI's trade dress claim, holding that MDI was not entitled to trade dress protection because there was no secondary meaning and the product was functional. *Marketing Displays, Inc. v. TrafFix Devices, Inc.*, 971 F. Supp. 262, 282 (E.D. Mich. 1997).[2] First, the court concluded that the only element of the trade dress at issue was the dual spring design because "[i]n a trade dress action, the ultimate issue is whether '[a] product feature's *primary significance* to consumers is as an identifier of source or as an element which contributes to the inherent appeal of the product.'" *Id.* at 267, quoting *Thomas & Betts Corp.*

---

[2]The district court also separately decided issues of trademark infringement and antitrust. MDI originally also brought a claim for trademark infringement because of TrafFix's use of a confusingly similar name and TrafFix counterclaimed on antitrust theories. *See Marketing Displays, Inc. v. Traffix Devices, Inc.,* 967 F.Supp. 953 (E.D. Mich. 1997). The court ruled in favor of MDI on the trademark claim and against TrafFix on its antitrust counterclaim; the Sixth Circuit later affirmed these rulings. *Id.* at 965; *Marketing Displays, Inc. v. Traffix Devices, Inc.,* 200 F.3d 929, 942 (6th Cir. 1999).

*v. Panduit Corp.,* 65 F.3d 654, 659 (7th Cir.1995) (emphasis added). Based upon this, no reasonable trier of fact could conclude that there was secondary meaning in the trade dress. *Marketing,* 971 F. Supp. at 269. Second, the court found that the dual-spring design was functional and therefore not entitled to trade dress protection. *Id.* at 276. Noting that the burden was on MDI to prove that its trade dress was nonfunctional, the court based its finding of functionality upon three things: (1) the design was claimed in two MDI expired utility patents; (2) MDI touted the utilitarian advantages of the design in advertisements; and (3) the design affected the cost and quality of the traffic signs. *Id.*

### 2. The Court of Appeals for the Sixth Circuit Decision

The Court of Appeals for the Sixth Circuit reversed the district court's trade dress ruling, holding that the lower court erred both in its finding no secondary meaning and in finding that the dual spring design was functional. *Marketing Displays, Inc. v. TrafFix Devices, Inc.,* 200 F.3d 929, 938, 940 (6th Cir. 1999). The Sixth Circuit also found that the lower court erred in only looking to the dual spring design when evaluating MDI's trade dress. *Id.* at 940 ("It takes little imagination to conceive of a hidden dual-spring mechanism or a tri or quad-spring mechanism that might also avoid infringing [MDI's] trade dress.").

### 3. The Supreme Court Decision

The Supreme Court granted certiorari to decide whether the existence of an expired utility patent forecloses the possibility of the patentees claiming trade dress protection in the product's design. 530 U.S. 1260 (2000). In its decision, the Court first discussed the burden of proof on a party asserting trade dress protection when that party also holds an expired

utility patent for the design. Second, the Court explained how to determine whether the expired patent overlaps with the trade dress claim. Third, the Court discussed the doctrine of functionality and clarified when a court should use the traditional or competitive necessity tests. Last, the Court determined that MDI's previous utility patents precluded it from seeking trade dress protection because the design was functional.

### a.    *Burden of Proof*

The Court began by discussing the statutory authority for the type of trade dress protection asserted by MDI. *Id.* at 28-29. Under the Lanham Act, there is a general provision which protects "any word, term, name, symbol, or device, or any combination thereof ... which is likely to cause confusion ... as to the origin, sponsorship, or approval of his or her goods. . ." *Id.* at 28-29; 15 U.S.C. § 1125(a)(1)(A). However, the Court then noted that under the Lanham Act, the person asserting trade dress protection has the burden of proving that the matter sought to be protected is not functional. *Id.* at 29. This is because trade dress protection may not be sought for product features that are functional. *Id.* Indeed, the Court noted that it had previously cautioned against "misuse or over extension of trade dress". *Id.* In many instances, there is no prohibition against copying goods and products. *Id.*

Next, the Court moved on to what it considered to be the central issue in the case: the effect of an expired utility patent on a claim of trade dress infringement. *Id.* The Supreme Court concluded that a prior patent has "vital significance in resolving the trade dress claim" because a utility patent "is strong evidence that the features therein claimed are functional."

*Id.*  Thus, a previous utility patent adds "great weight" to the already burdensome statutory presumption that the features are deemed functional.  *Id.* at 30.  In order to overcome this "heavy burden", a person seeking trade dress after an expired patent must show that the feature is not functional by showing that it is "merely an ornamental, incidental, or arbitrary aspect of the device."  *Id.*

> **b.      Looking to the "Essential Feature" and "Central Advance" to determine Functionality**

The Court next turned to the question of whether MDI's expired patents claimed the same features for which trade dress protection is sought.  That is, the Court analyzed whether the patent and trade dress overlapped.  *Id.* at 30.  Instead of focusing on the individual features of the claimed trade dress, the Court compared the "essential feature" of MDI's claimed trade dress against the "central advance" claimed in the expired utility patents.  *Id.* The Court concluded that the essential feature of the trade dress and the central advance of the expired utility patents were the same: the dual-spring design.  Therefore, because the patent and trade dress sought to protect the same essential element, the trade dress claim was barred because MDI was unable to overcome at the summary judgment stage the "strong evidentiary inference of functionality based on the disclosure of the dual-spring design in the claims of the expired patents."  *Id.*

The Court concluded that the patent and trade dress claim overlapped despite the fact that the dual spring design in the patent was a very different looking device than the dual spring design at issue in the trade dress claim.  *Id.*  In the patent, the dual springs were much

12

farther apart than the springs in the trade dress product. This didn't matter, the Court concluded, because under the doctrine of equivalents, there can be patent infringement "even when the accused product does not fall within the literal terms of the claims." *Id.* at 31, citing *Sarkisian v. Winn-Proof Corp.*, 697 F.2d 1313, 1321-22 (9th Cir. 1983) (noting that the doctrine of equivalents allows a finding of patent infringement even when the accused product does not fall within the literal terms of the claims); *see generally Warner-Jenkinson Co. v Hilton Davis Chemical Co.*, 520 U.S. 17 (1997) (discussing and upholding the doctrine of equivalents).

The Court next looked to the language of the MDI patents to explain why the existence of an expired utility patents constitutes strong evidence of functionality. *Id.* The Court noted that the expired patents described the purposes of the spring design: the design kept signs upright even in heavy wind conditions; the dual-spring (as opposed to a single spring) prevented twisting of the sign in the wind; and the two spring construction was more cost-effective than three. *Id.* at 32. These statements demonstrated to the Court the functionality of the design: "the dual-spring design provides a unique and useful mechanism to resist the force of the wind." *Id.* at 33. The Court concluded that MDI had not overcome the heavy burden of showing that the trade dress claimed was non-functional and reversed the Sixth Circuit's decision.

### c.     *Clarification of the tests for Functionality*

In finding for MDI on the trade dress issue, the Supreme Court went on to discuss the test for functionality. The Supreme Court noted that there was confusion as to the proper

application of trade dress principles and that the Sixth Circuit had erred in describing the test for functionality. *Id.* at 32. The Court clarified that the test for assessing the functionality of a product design is the traditional rule originally set forth in *Inwood Laboratories, Inc. v. Ives Labaratories, Inc.*, 456 U.S. 844, 850, n. 10 (1982). Under that traditional rule, "a product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Traffix,* 532 U.S. at 32. Although the Court noted that it had expanded upon the meaning of this phrase in *Qualitex*, 514 U.S. at 165, when it determined that a feature is also functional when "exclusive use of [the design] would put competitors at a significant non-reputation-related disadvantage," the Court made clear that this test was not meant to displace the traditional test set forth in *Inwood*. *Id.* at 32-33. Indeed, the Court stated that where the design is functional under the *Inwood* test, there is no need to consider if there is a competitive necessity. *Id.* at 33. In *Qualitex*, the so-called 'competitive necessity' test was only applied to the question of aesthetic functionality of the color only after it was determined that the color had no bearing on the use, purpose, cost or quality of the product. *Id.*

Further, the Court stated that if a device was functional, there was no need to determine whether the design had acquired secondary meaning. *Id.* ("Functionality having been established, whether MDI's dual-spring design has acquired secondary meaning does not need to be considered."). Moreover, if the device is functional, there is also no need to engage in speculation about other design possibilities (for example, whether three or four springs would serve the same purpose). *Id.* Because the dual-spring design is functional,

"competitors need not explore whether other spring juxtapositions might be used." *Id.* at 33-34.

### d. MDI's Dual Spring Design Was Functional

The Court concluded by again stressing the difference between patent and trade dress protection. *Id.* at 34-35. "The Lanham Act does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity." *Id.* at 34. "[F]urthermore, [the Lanham Act] does not protect trade dress in a functional design simply because an investment has been made to encourage the public to associate a particular functional feature with a single manufacturer or seller." *Id.* at 34-35. In the case of MDI's product, under the traditional test for functionality, the dual-spring design provided a unique and useful mechanism to resist the force of the wind; because the dual-spring design was the reason the device worked, it was not an arbitrary flourish and other designs need not be attempted. *Id.* at 34-35.

*Traffix* guides the case before this Court today. It treats the expired utility patent as "strong evidence" of functionality, and it shows that a feature may be functional if it is "essential to the use or purpose of the article" or "affects the cost or quality of the article." *Id.* at 35.

## C. APPLYING *TRAFFIX*

### 1. Burden of Proof

As noted above, the Supreme Court began by discussing the burden of proof in a trade dress claim. Under the Lanham Act, the person asserting trade dress protection has the

burden of proving that the matter sought to be protected is not functional. *Id.* at 29. The Court concluded that a prior patent has vital significance in resolving the trade dress claim because a utility patent is strong evidence that the features are functional. Thus, a previous utility patent adds "great weight" to the already burdensome statutory presumption that the features are deemed functional. *Id.* at 29-30.

The case at hand is distinguishable from *Traffix* because in *Traffix*, the party claiming trade dress infringement did not possess a registered trademark whereas here, Stull received trade dress registration from the Patent and Trademark Office ("PTO"). With that trade dress comes a presumption of validity. 15 U.S.C. § 1057(b). However, this presumption of validity dissolves upon the presentation of any evidence of invalidity:

> The presumption of validity that federal registration confers (see 15 U.S.C. Section 1115 (a)) evaporates as soon as evidence of invalidity is presented. [cites omitted]. Its only function is to incite such evidence, and when the function has been performed the presumption drops out of the case.

*Door Systems Inc. v. Pro-Line Door Systems Inc.*, 83 F.3d 169, 172 (7th Cir. 1996). Although these two presumptions are at odds with each other, the presumption of validity drops out of the case if it is rebutted with the presentation of *any* evidence of invalidity. In this case, the expired utility patent provides evidence of invalidity that causes the presumption of validity to drop out of the case. *Traffix*, 532 U.S. 23 at 30. Therefore, the heavy burden of proving non-functionality remains upon Stull.

### 2. Looking to the "Essential Feature" and "Central Advance" to determine Functionality

Under the Supreme Court test, the Court next turns to the question of whether the "essential feature" of the trade dress and the "central advance" claimed in the expired '778

Patent overlap. In this regard, the Court agrees with Stull that the proper focus is on the overall look of the product. First, it is important to note that the cap protected by the expired patent and the cap Stull seeks to protect under trade dress are identical. Here, the central advance claimed in the expired patent is a unique locking cap that provides a novel and improved leak resistant and child-safe locking arrangement for holding the cap permanently captive on the container, while at the same time not interfering with the assembly and filling of the container at the manufacturing facility. '778 Patent, Col. 4, Lines 7-14. The essential feature of the trade dress is a unique looking locking cap that fits on charcoal lighter fluid and similar containers. The Court concludes that the essential feature of the claimed trade dress and the central advance of the expired patent are one and the same. That is, the look of the cap is necessary to the cap's operation; it is the reason the device works, and is therefore purely functional. This cap is not a whimsical design now being marketed as an alternative cap for soda bottles, but rather it is a cap designed to address specific functions and safety needs.

Second, the following marketplace advantages are claimed in Stull's expired '778 Patent:

> A related object of the invention is the provision of a closure as above characterized, wherein the parts can be economically molded in plastic, in simple mold cavities.

> Still another object of the invention is to provide an improved closure which in accordance with the foregoing can be readily assembled to a dispensing container with a minimum of time, and employing high production techniques such as the use of automatic capping equipment.

A still further object of the invention is the provision of a closure construction wherein only minor modification of the existing container neck is required in order to accommodate the closure cap, such modification not materially affecting the overall dimensions of the neck, or of the adjacent areas of the container itself.

A feature of the invention is the provision of a closure construction wherein a cap body is adapted to be screwed directly onto a container neck and permanently retained thereon, and wherein the container neck is integral with the remainder of the container, whereby the neck cannot separate, and such that leakage from the neck area is completely eliminated.

Yet another object of the invention is the provision of a closure cap as above characterized, which further incorporates reliable child-resistant safety features to prevent inadvertent removal of the cover by small children, thereby minimizing the likelihood of spillage or swallowing of the contents, etc.

The above objects are accomplished by the provision of a closure cap construction for a dispensing container, the cap being of the type intended to remain captive on the container at all times, and having a dispensing orifice which can be selectively closed off, to thereby control the discharge of the container contents. . .The cap also includes an annular seal, which engages a cooperable seal surface on the neck of the container, at a location on the lip of the neck or on the inner surface thereof, such location being substantially completely free of any discontinuities of the type resulting from joining of molded parts, etc. As a result, a positive seal is achieved. This is considered to be very important from the standpoint of safety, since often such containers are used with toxic and/or flammable fluids. In the event that the seal between the closure cap and container neck were deficient, leakage could result. Such leakage could present a threat to small children, from the standpoint of either accidental poisoning or inadvertent fire.

'778 Patent, Col. 2 Lines 34-68; Col. 3 Lines 9-14; Col. 3 Lines 32-45.

Third, the cap for which Stull now seeks trade dress protection is the preferred embodiment disclosed and claimed in the '778 Patent. Knowing that technology protected by the patent becomes available to the public upon the expiration of the patent, Stull taught, disclosed, and claimed the cap which Berlin is now producing.

A feature by feature analysis also leads to the same conclusion. The following

elements, which Stull claims create the unique look of the cap, serve a functional purpose and are discussed in the patent. Those features include:

    i.      flat, semi-circular-shaped top;
    ii.     cover cap that is recessed in the closed position;
    iii.    large bead around the orifice area;
    iv.     two crescent shapes arranged on either side of the top of the cap;
    v.      tab in the shape of a circle with two triangular edges on its front, forming a "cat face"
    vi.     singular strap situated at the back of the tab;
    vii.    square-shaped gap in the back of the cap; and
    viii.   three holes in the orifice area

The "two crescent shapes arranged on either side of the top of the cap" and the "cover cap that is recessed in the closed position" serve child safety functions. '778 Patent, Col. 5, Lines 51-60. The barriers and recessed cap prevent a child from being able to open the cap. '778 Patent, Col. 5, Lines 51-60. The "square-shaped gap in the back of the cap" provides clearance for the strap when the cover is installed. '778 Patent, Col. 6, Lines 8-15. The "large bead around the orifice area" and the "annular seal" provide a strong seal to minimize leakage and the "tab in the shape of a circle with two triangular edges on its front, forming a 'cat face'" allows the user to lift the cover with his or her fingernail. '778 Patent, Col. 5, Lines 21-31, and Lines 43-48. The "singular strap situated at the back of the tab" eliminates the possibility of losing or misplacing the cap. '778 Patent, Col. 5, Lines 37-42. The "three holes in the orifice area" make it difficult to re-fill the container which constitutes an important function from a safety standpoint. '778 Patent, Col. 7, Lines 26-33.

Those elements that make the cap unique, and therefore deserving of the patent, are the same features for which Stull received a patent. The cap looks the way it does and is

designed in a specific way because that "look" is necessary to its operation; the cap's design furthers the purpose of the cap claimed in or protected by the '778 Patent. As noted above, that purpose is to provide a novel and improved leak resistant locking arrangement for holding the cap permanently captive on the container. Because the look of the cap is necessary for its operation and is not ornamental, the essential feature and the central advance claimed overlap. Under the *Traffix* analysis, the locking closure cap is functional as a matter of law.

### 3. Functionality Under the Traditional Test

Although the *Traffix* Court decided that the dual-spring design was functional based upon the existence of an overlapping expired patent, the Court went on to clarify the correct application of the various functionality doctrines. The Court explained that if a design was functional under the traditional test (if the product feature "is essential to the use or purpose of the article or if it affects the cost or quality of the article" *Inwood,* 456 U.S. at 32-33) there is no need for a court to consider whether that design is functional under the competitive necessity test, whether there was secondary meaning, or whether there were other design possibilities. *Traffix*, 523 U.S. at 33.

In this case, nearly every element claimed in Stull's trade dress can be directly linked to a functional purpose in the expired '778 Patent. Under the *Traffix* analysis, the essential feature of the trade dress is functional and therefore Stull does not have a valid trade dress. Nevertheless, Stull claims that there are five additional features in the trade dress which are not explicitly claimed by the patent, and so a question of fact remains as to functionality.

These features are: 1) vertical lining at the base of the cap; 2) the words "pry open" and an arrow at the top of the cap; 3) the material composition of the cap; 4) the size of the cap; and 5) the color. Although it is clear that the essential feature of the trade dress is functional, these additional five features are also functional under *Inwood*.

First, the vertical lining at the base of the cap is functional and not ornamental because it provides a grip for applying torque necessary to attach the cap to the container. The '778 Patent specification discloses that one object of the cap was to provide a closure that "can be readily assembled to a dispensing container with a minimum of time, and employing high production techniques, such as automatic capping equipment." '778 Patent, Col. 2, Lines 45-48. Under *Inwood*, these vertical lines are essential to the use or purpose of the cap and also effect its cost and quality.

Second, the words "pry open" and the arrow on the top of the cap are also clearly functional under *Inwood*. These instructions are not ornamental because they are essential for the use of the device - they instruct the user of the device how to operate it.

Third, the material composition of the cap is also clearly a functional element under *Inwood*. The cap's material composition is dictated by the requirement to provide a sufficiently robust cap to meet the requirements of the packager while meeting the '778 Patent specification objective of "fabricat[ion] at minimum overall expense." '778 Patent, Col. 2, Line 39. The patent specifically notes that "the plastic material of which the cap and neck are constituted is sufficiently tough to prevent breaking of the teeth in the event that unscrewing of the cap is attempted...." '778 Patent, Col. 6, Lines 43-45. Thus, the material

composition of the cap is essential to its use or purpose.

Fourth, the size of the cap body is functional. The interior dimensions of the cap are determined by the requirement it fit on the standard 28 mm bottle container. This cannot be considered an arbitrary or ornamental feature; a correctly-fitting cap is essential to the cap's use.

Finally, the color of the cap, red, is also functional. The color red is meant as a warning that the material contained therein is dangerous. Thus, the red color is essential to the use or purpose of the cap under *Inwood*. Alternatively, the color red is also functional under the competitive necessity test under *Qualitex*. 514 U.S. at 165. That is, exclusive use of the color red would put competitors at a significant non-reputation-related disadvantage because sellers of dangerous materials such as lighter fluid desire red "warning" caps. *See Mountain Safety Research, Inc. v. Coleman Outdoor Products Inc.*, 869 F. Supp. 818, 821 (W.D. Wash. 1993) ("[T]he color red is often used to connote caution"); *Forscher Group, Inc. v. Arrow Trading Co.*, 124 F.3d 402,407 (2d Cir. 1997) (finding that the competitor's use of the color red for its pocket knives was not likely to confuse a consumer).

Every element of Stull's claimed trade dress is functional under *Inwood* and therefore there is no need to explore alternative designs or secondary meaning. *Traffix,* 532 U.S. at 33-34. Because the essential feature of the trade dress is the same as the central advance in the patent, and because all of the claimed features of the trade dress are independently functional, there is no issue of material fact which needs to be decided by a finder of fact. The claimed trade dress is functional.

Because the Court has decided this motion on the issue of functionality, it will not address Berlin's constitutional claim that it has a constitutional right to copy the patented object upon the expiration of the patent pursuant to Article I, Section 8, Clause 8 of the Constitution. *See Da Star Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34 (2003) (refusing to extend the Lanham Act in fear of creating "a species of mutant copyright law that limits the public's federal right to 'copy and to use,' expired copyrights"); *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U. S. 141, 165 (1989) ("For almost 100 years it has been well established that in the case of an expired patent, the federal patent laws do create a federal right to 'copy and use.'").

## V. CONCLUSION

Stull obtained a utility patent on his very creative invention: a locking closure cap meant to fit on the top of containers for various types of liquids, including toxic and flammable liquids, that is both child-resistant and leak proof.  Stull obtained this utility patent because every element of this invention had a functional purpose; the design was successful and remained unaltered for several years during the period of exclusivity.  Stull was accorded exclusive use of the invention during the life of the patent.  However, now that the patent is expired, Stull claims that this exact same cap deserves trade dress protection.  The trade dress claim fails because the "central advance" of the expired '778 Patent and "essential feature" of the trade dress are the same: a unique locking cap that is safe and secure.  Trade dress protection cannot be afforded because the locking closure cap is functional.  **Therefore, the Court grants Berlin's Motion for Partial Summary Judgment on Count I (Declaratory Judgment as to the Lanham Act) and Count II (Declaratory Judgment as to Illinois Law) of its Amended Complaint and Counts I - VII of Stull's counterclaim.**

**SO ORDERED THIS 9TH DAY OF AUGUST, 2004.**

_____
**MORTON DENLOW**
**United States Magistrate Judge**

**Copies mailed to:**

Marvin N. Benn
Stephen J. Cassin
Much Shelist Freed Denenberg
   Ament & Rubenstein, P.C.
191 North Wacker Drive
Suite 1800
Chicago, IL 60606-1615

Attorneys for Plaintiff

Kristin Joy Achterhof
Julie P. Setren
Katten Muchin Zavis Rosenman
525 West Monroe Street
Suite 1600
Chicago, IL 60661-3693

Attorneys for Defendant